UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/2025
```

RYAN STANCU,

                          Plaintiff,

            -against-

NEW YORK CITY/PARKS DEPT,

                          Defendant.

20-CV-10371 (MMG)

**<u>OPINION & ORDER</u>**

MARGARET M. GARNETT, United States District Judge:

### INTRODUCTION

*Pro se* Plaintiff Ryan Stancu ("Stancu"), a former employee of the New York City Parks Department ("Parks Department" or "Defendant"), brings claims of discrimination, retaliation, and hostile work environment against the Parks Department under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). Defendant now moves for summary judgment on all claims. For the reasons that follow, Defendant's motion is GRANTED in its entirety.

### BACKGROUND

#### I.    FACTUAL BACKGROUND[1]

Stancu identifies as a "life-long devoted Orthodox Christian." Reynolds Decl. Ex. F at 2, Dkt. No. 81-6. He wears a beard, which he says is part of his religious observance. Final Am. Pet. Ex. A at 2, Dkt. No. 63. Stancu maintains that, according to his religious beliefs, "attending services and prayers every Sundays [*sic*] is a must." Reynolds Decl. Ex. F at 2. Stancu's claims

---

[1] The relevant facts, taken from the Final Amended Petition ("Final Am. Pet.") and materials submitted in connection with the pending motion, are either undisputed or described in the light most favorable to Plaintiff. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

in the litigation all stem from alleged harassment and discrimination by the Parks Department on the basis of Stancu's religion, relating principally to Stancu's beard and his desire to regularly attend religious services.

Stancu began his employment with the Parks Department sometime in 2018, starting as a seasonal aide. *See* Def.'s Rule 56.1 Statement of Undisputed Facts ("SUF") ¶ 1, Dkt. No. 80. In mid-to-late September of that year, he attended the Parks Enforcement Patrol Academy (the "Academy") to be trained as an Urban Park Ranger. *Id.* ¶ 2. Although completing the Academy would allow Stancu to become an ordinary park ranger, the Parks Department requires rangers to meet additional requirements before becoming deputized as Special Patrolmen, which is sometimes referred to within the Department as achieving "shielded" status. *Id.* ¶ 8–9. One of those additional requirements is passing a background check conducted by the New York City Police Department. *Id.* ¶¶ 9, 12. Stancu completed the Academy and later submitted an application to become a Special Patrolman. *Id.* ¶ 10. During his time at the Academy, Stancu was informed that the Parks Department did not permit park rangers to wear beards unless they had been granted a religious or medical accommodation; he also received a copy of an Urban Park Service Field Manual describing that policy. *Id.* ¶¶ 4–6.

After completing the Academy, Stancu was assigned to work as an Urban Park Ranger at Pier 15 in Lower Manhattan. *Id.* ¶ 24. During his first day on the job on November 15, 2018, Stancu was told by a supervisor, Sergeant Edward O'Neill, that the Parks Department did not permit beards. *Id.* As a sergeant, O'Neill was responsible for ensuring compliance with the Parks Department's beard policy. *Id.* ¶ 50. At the time of his first comment to Stancu about his beard, O'Neill was unaware of Stancu's religion. *Id.* ¶ 24. Stancu told O'Neill that his beard was for religious purposes, but he did not present documentation of any religious

2

accommodation, despite O'Neill's request. *Id.* ¶ 25. Indeed, Stancu had not formally requested

a religious accommodation at that time. *Id.* ¶ 30. During the interaction, O'Neill allegedly stated

to Stancu, "We are not in the stone age." *Id.* ¶ 25. The next day, Stancu provided O'Neill with a

letter from his church explaining that he wore a beard in observance of his religion. *Id.* ¶ 26.

Stancu did not face discipline or any change to his job following the interactions with

O'Neill on November 15 and 16, 2018, and he continued to maintain his beard. *Id.* ¶ 29. Stancu

believed, however, that O'Neill's remarks to him were disparaging, and on November 23, 2018,

he contacted a union agent and the Parks Department Commissioner to complain. Final Am. Pet.

¶¶ 8–9. Someone at the Commissioner's office allegedly assured Stancu that he would be able

keep his beard and take Sundays off. *Id.* ¶ 9. Although Stancu still did not pursue a formal

religious accommodation at that time, as Stancu continued at the job, he allegedly was subjected

to more disparaging comments. O'Neill allegedly said "people have to choose their jobs or their

beards" while looking at Stancu in December 2018. SUF ¶ 34. O'Neill also allegedly said that

"No religion or Union crook will change our rules" in December 2018. Pl.'s Mem. in Resp. to

Def.'s Mot. for Summ. J., Ex. E ("Stancu Decl.") ¶ 7, Dkt. No. 87; *see also* SUF ¶ 35.

A different superior, Sergeant DeJesus, informed Stancu at some point prior to July 24,

2019,[2] that Stancu was not on the "beard list" and needed to submit a request for an

accommodation. SUF ¶ 39. Stancu then requested and received from Jessenia Aponte, then

Chief of Staff to the Assistant Commissioner for Urban Park Service, the form required for

requesting a religious accommodation. *Id.* ¶ 41; Decl. of Jessenia Aponte ("Aponte Decl.) ¶ 5,

Dkt. No. 79. Stancu completed the form and submitted it on July 30, 2019, requesting a religious

---

[2] Stancu testified that O'Neill stopped showing up for work sometime around the mid-point of
2019. Reynolds Decl. Ex. A ("Stancu Dep.") at 110:9–18, Dkt. No. 81-1.

accommodation to wear his beard and have Sundays off to attend religious services and pray.
SUF ¶ 42.  On August 14, 2019, the request was partially approved—he was granted an
accommodation to wear his beard and to take one Sunday off per month.  *Id.* ¶ 44.  After
receiving the religious accommodations, Stancu allegedly faced harassing comments from
several superiors.  DeJesus joked multiple times that Stancu looked ugly and asked if Stancu was
Islamic.  *Id.* ¶ 47.  Sergeant Candia told Stancu he was "full of shit," although the context of this
remark is not clear.  *Id.* ¶ 48.

A superior to the sergeants, Captain David Calderon, sent emails to the sergeants in 2018
and 2019 indicating that he was personally noticing that some male rangers were shaving and
shaping their face in violation of Department rules.  *Id.* ¶ 53; Reynolds Decl. Ex. J, Dkt. No. 81-
10; Reynolds Decl. Ex. K, Dkt. No. 81-11.  Candia and other sergeants were directed by
Calderon to keep profiles on Urban Park Rangers to ensure compliance with Parks Department
policies, including a rule that individuals wearing a beard pursuant to a religious accommodation
may not shape their beard or shave parts of their face.  SUF ¶ 52–53.  From August 2019 to May
2020, Candia took a photograph of Stancu every week to "keep a profile of his beard."  Final
Am. Pet. ¶ 19; SUF ¶¶ 51–52.  Stancu claims this monitoring amounted to harassment.

Meanwhile, through the end of 2019, Stancu still had not received "shielded" status after
submitting his Special Patrolman application upon his graduation from the Academy in late
2018.  SUF ¶10; Aponte Decl. ¶ 31.  For over a year, the withholding of shielded status made
Stancu ineligible for promotion and subject to possible termination, although there were no
opportunities for promotion in any event.  Final Am. Pet. ¶ 12; SUF ¶ 21.  Stancu testified that he
was "one of the last, if not, the last, person to get shielded" from his class at the Academy,[3] and

---

[3] This belief has no factual foundation.  Approximately 44 individuals graduated from the
Academy with Stancu. Out of this group, 6 applicants were not "shielded" at all, 27 were shielded before

he believed, without evidence, that O'Neill and Calderon caused his application to be delayed through their connection to the person in charge of the process. SUF ¶ 14–15; Stancu Dep. 118:1–119:2; 131:22–133:2. When Stancu inquired about his status, he alleges that the Parks Department fabricated an excuse that "somebody lost the paperwork." Final Am. Pet. ¶ 12.

On January 1, 2020, Stancu learned that he was being transferred from Pier 15 to Washington Square Park. SUF ¶ 54. Captain Adrienne Johnson informed him that the transfer was necessary to fill certain vacancies caused by the resignation of other rangers at the park. *Id.* ¶ 55. Stancu asked Johnson about his shielded status, finding it "ironic" that he would be assigned to Washington Square Park, which was "known for . . . writing tickets," given that he could not issue tickets as an unshielded officer. Stancu Dep. 119:9–18. On January 1 and 5, 2020, Captain Brown emailed Jessenia Aponte, Tesha Martin, and Kenneth Brown, who handled Special Patrolman applications, to ask about the status of Stancu's application. SUF ¶ 16; Stancu Dep. 119:3–5. On January 7, 2020, Mr. Brown informed Johnson that the NYPD investigator assigned to review Stancu's application, Guetty Dodson, was "taking a closer look" at something that Stancu was involved in in 2018. SUF ¶ 18. The next day, Aponte informed Stancu that the NYPD, not the Parks Department, conducts background checks and that it had not yet completed its investigation for Stancu. *Id.* ¶ 19. Stancu was granted shielded status and deputized by the end of January 2020. Stancu Dep. 120:7-15; Aponte Decl. ¶ 31.

Stancu's first day at Washington Square Park was January 17, 2020. SUF ¶ 60. On January 28, 2020, Stancu and others reported symptoms of carbon monoxide poisoning. *Id.* ¶ 66. Maintenance workers informed him that they had sprayed carbon monoxide into rat holes in the

---

Stancu (including 13 just one month before him), and 10 were shielded after Stancu (several significantly after). *See* Aponte Decl. ¶¶ 29-32, Dkt. No. 79.

park, a practice that Stancu believed had been taking place for months. *Id.* ¶¶ 63, 66–67. After the carbon monoxide poisoning incident, Stancu attended a meeting with the Parks Commissioner and other superiors to discuss the use of carbon monoxide for exterminating rats. *Id.* ¶¶ 68–69. Although the superiors promised to fix the problem, a second carbon monoxide poisoning incident occurred on February 22, 2020. *Id.* ¶¶ 69–71. After that incident, Stancu and four other Urban Park Rangers were permitted to leave work on account of illness. *Id.* ¶ 73. Stancu later confronted Calderon and Sergeant Rivera regarding the carbon monoxide issue and indicated that he may report "the entire situation" to the mayor. *Id.* ¶ 74. Then, on February 28, 2020, Stancu was reprimanded for insubordination because he failed to call out sick prior to leaving work after the second carbon monoxide poisoning event on February 22. *Id.* ¶ 75.

Finally, Stancu alleges that he was threatened with write-ups throughout his entire employment for failing to issue enough citations, which he claims was motivated by discrimination and retaliation. *Id.* ¶ 76; Final Am. Pet. ¶ 26. On May 2, 2020, Candia allegedly pushed down a girl who was roller blading or riding a skateboard in the park, injuring her, and then ordered Stancu not to call for medical help and instead to issue a summons to the girl, which Stancu refused to do. Stancu Dep. 297:1–298:19; Stancu Decl. ¶ 24. Sometime shortly thereafter, Stancu found a note in his locker reading "Parks is not your church. Get the fuck out of here. Go to your church and work there." Final Am. Pet. ¶ 28; Stancu Dep. 308:12–16. Although Stancu testified that he did not see Candia place the note, Stancu saw Candia in the building that day and believes that Candia was responsible for the note. Stancu Dep. 308:19–25.

Stancu ultimately resigned from the Parks Department on May 10, 2020, citing an ongoing history of harassment. SUF ¶ 78; Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J., Ex. D., Dkt. No. 87.

## II.    PROCEDURAL HISTORY

On June 26, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Dkt. No. 39 at 4–5. On September 17, 2020, the EEOC issued Plaintiff a Right to Sue notice.  *Id.* at 3.  Plaintiff filed this action on December 8, 2020. Dkt. No. 2.  Defendant filed a motion to dismiss on September 10, 2021, which was granted in part and denied in part in an opinion issued by Judge Andrew L. Carter, Jr., on September 29, 2022.  *See* Opinion & Order ("MTD Opinion"), Dkt. No. 41.   Defendant moved for summary judgment on the surviving claims on March 1, 2024.  *See* Dkt. No. 77.  Thereafter, this case was reassigned to the undersigned.  *See* Dkt. No. 86.

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025). A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Where, as here, the party opposing summary judgment bears the burden of proof at trial, summary judgment should be granted if the moving party can 'point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in his pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  "But [a] motion for summary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (internal references omitted).

It is well established that courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment.  *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).  Thus, a court must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." !*Kravitz v. Purcell*, 87 F.4th 111, 119 (2d Cir. 2023) (quoting *Publicola v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022)).  This special solicitude is not unlimited, however, and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal references omitted).  "In other words, 'the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-

write it.'"  *Cheng v. United States*, 725 F. Supp. 3d 432, 437 (S.D.N.Y. 2024), *aff'd,* 132 F.4th

655 (2d Cir. 2025) (quoting *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y.

2009)).

## II.    DISCRIMINATION CLAIMS

In its prior opinion, the Court found that Stancu sufficiently pleaded a discrimination

claim based on both a disparate treatment theory and a failure to accommodate theory.  It found

that Stancu alleged two adverse employment actions to support a disparate treatment claim:

(1) the delay in receiving shielded status; and (2) the transfer to Washington Square Park.  *See*

MTD Opinion at 8.  It also held that the failure-to-accommodate claim could survive because

Defendant had not rebutted Stancu's allegation that his accommodation did not eliminate the

conflict between his employment requirement and his religious practices.  *See id.* at 10.

Considering the evidence now in the record and viewing it in the light most favorable to Stancu,

the disparate treatment claim must fail because Stancu cannot show that either of the

aforementioned situations amounted to an adverse employment action.  And even if he could

show that either event was an adverse employment action, he could not show circumstances

supporting an inference of discrimination.  Additionally, his failure-to-accommodate claim must

be dismissed as time-barred.

### A.  The *McDonnell-Douglas* Framework

Discrimination claims brought under Title VII are subject to the three-step burden-

shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See,*

*e.g.*, *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 65-66 (S.D.N.Y. 2016).  Under that

framework, the plaintiff bears the initial burden of establishing a *prima facie* case of

discrimination.  *See* 411 U.S. at 802.  To establish a *prima facie* case under Title VII, a plaintiff

must show that: (1) he was a member of a protected class; (2) he was competent to perform the

job in question or was performing the job duties satisfactorily; (3) he suffered a materially adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination. *See, e.g.*, *Jeune v. City of N.Y.*, No. 11-CV-7424 (JMF), 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014).

If the plaintiff makes out a *prima facie* case, "the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal references omitted). If the defendant does so, the plaintiff "may no longer rely on the presumption raised by the prima facie case," but rather must present evidence either that "the employer's stated reason for the adverse employment action is entirely pretextual" or that unlawful discrimination was a "motivating factor" in the defendant's employment decision. *Id.* at 138, 141.

## B. Delay in Receiving Shielded Status

The MTD Opinion analogized the delay in receiving shielded status to a delay in receiving a promotion, which Courts have held can constitute an adverse action, s*ee* MTD Opinion at 8–9, but the now-developed factual record shows that analogy is untenable. Although Stancu alleges that the delay in receiving his shielded status caused him financial injury by, for example, making him ineligible for promotion, there is no evidence that any promotions were even available. *See, e.g.*, SUF ¶ 21. He cannot show that he suffered an adverse employment action based on the hypothetical withholding of nonexistent promotions. *See Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (dismissing failure-to-promote claims because the plaintiffs failed to allege "that they were interested in a promotion or that there was an open position to which they could have (or would have) applied"). Even assuming that shielded status is sufficiently akin to a promotion for Title VII purposes, Stancu still cannot demonstrate that the purported delay was an adverse employment action. "[A] delay in

10

promotion is not an adverse employment action where '[plaintiff] does not allege that [defendant] denied him an available transfer, that [defendant] failed to pay his salary during the interim period, or that the delay in any way harmed his career.'" *Toussaint v. City of N.Y.*, No. 19-CV-01239 (AT), 2021 WL 4429316, at *6 (S.D.N.Y. Sept. 27, 2021) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogated on other grounds*, *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).  Stancu's claim therefore fails because he offers no evidence that he was harmed in a legally-cognizable way by the purported delay in his receiving shielded status.

Moreover, Stancu fails to show circumstances supporting an inference of discrimination. The record now shows that the delay in approving Stancu's Special Patrolman application was unexceptional—rather than being the "last or one of the last" people in his Academy class to be shielded, as Stancu originally claimed, he was the 28th to be deputized from a class of at least 44, and many of those deputized before him were shielded just a month prior to Stancu.  *See* Aponte Decl. ¶¶ 29–30.  It is true that a Title VII plaintiff's burden to establish a prima facie case is minimal, *see Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001), but Stancu offers no evidence connecting his protected status to the time that elapsed before he was shielded, and no evidence that he was treated differently from similarly situated employees.  *See Hernandez v. City of N.Y.*, No. 18-CV-05870 (ER), 2019 WL 2410129, at *5 (S.D.N.Y. June 7, 2019).  Stancu therefore cannot make out a prima facie case of discrimination.

Further, even if he could make out a prima facie case, Stancu would fail the third step of the *McDonnell Douglas* framework.  Defendant has adduced evidence that the NYPD investigator assigned to Stancu's application simply required additional time to complete her investigation of Stancu's background, a matter outside of Defendant's control.  Even if there

were evidence that the investigation was unduly delayed (which there is not), Defendant has provided a legitimate, non-discriminatory explanation for the time required to process Stancu's application. *See Fitchett v. City of N.Y.*, No. 18-CV-08144 (PAE), 2021 WL 964972, at *15 (S.D.N.Y. Mar. 15, 2021) ("[W]hile unflattering, the explanation that defendants muster—of bureaucratic inefficiency—is supported by the evidence and supplies, on the summary judgment record, a race-neutral justification for the delay that [Plaintiff] experienced."). Stancu presents no evidence that the explanation is pretextual. There is nothing in the record, other than Stancu's unfounded speculation, to suggest that religious discrimination was the reason he was not granted shieled status sooner. *See Hawkins v. N.Y. State Off. of Mental Health*, No. 17-CV-00649 (NSR), 2019 WL 4520801, at *12 (S.D.N.Y. Sept. 19, 2019), *aff'd*, 845 F. App'x 9 (2d Cir. 2021) (summary order) ("Plaintiff's own self-serving statements, in her affidavits, memoranda, and deposition are simply insufficient to overcome her burden of proof to survive summary judgment, as they are all self-serving statements uncorroborated by any additional evidence."); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 29 (E.D.N.Y. 2015) ("A plaintiff cannot merely rationalize, explain, or disagree with an employer's proffered non-discriminatory reasons to survive summary judgment.").

### C. Transfer to Washington Square Park

Stancu similarly cannot support a claim for discrimination based on his transfer from Pier 15 to Washington Square Park. In certain circumstances, a job transfer *can* be an adverse employment action. *See Galabya*, 202 F.3d at 641 (A job "transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career."). However, "[i]t is well-settled that a lateral transfer does not rise to the level of an adverse employment action as a matter of law, where the transfer has no impact on the employee's position, salary, or benefits." *Dietrich v. City of N.Y.*, No. 18-CV-07544 (CM), 2020

WL 4226591, at *7 (S.D.N.Y. July 23, 2020) (internal references omitted); *see also Pimentel v. City of N.Y.*, 74 F. App'x 146, 148 (2d Cir. 2003) (summary order) ("[A] forced transfer . . . is not an adverse employment action if the terms, privileges, duration, or condition of a plaintiff's employment do not change."); *Galabya*, 202 F.3d at 641 (affirming entry of summary judgment where plaintiff had not "produced evidence to show that the transfer was to an assignment that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement"). Stancu does not allege, much less offer evidence to support, that any terms or conditions of his employment changed in a materially adverse manner because of the transfer. He asserts that Washington Square Park was a "place that nobody wanted to go" and that he was "set in stone at Pier 15." Stancu Dep. 122:15–17, 210:18–211:7. But his conclusory assertions have no support in the record, and, in any case, "subjective dissatisfaction with assignments does not constitute adverse employment action." *Harrison v. N.Y.C. Off-Track Betting Corp.*, No. 99-CV-06075 (VM), 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); *see also Figueroa v. N.Y.C. Health & Hosps. Corp.*, No. 03-CV-09589 (NRB), 2007 WL 2274253, at *4 (S.D.N.Y. Aug. 7, 2007) ("[S]imply being assigned undesirable work duties and unfavorable work schedules are insufficient to establish adverse employment action, since they do not have a material impact on the terms and conditions of plaintiff's employment.").

The record does support that Stancu suffered carbon monoxide poisoning while working at Washington Square Park, and courts have held that "exposing a worker to dangerous or extreme work conditions may constitute an adverse employment action in certain circumstances." *Todoverto v. McDonald*, No. 13-CV-04922 (JCM), 2016 WL 3826281, at *11 (S.D.N.Y. July 7, 2016) (internal references omitted); *see also Edwards v. Metro-North Commuter R.R. Co.,* No. 04-CV-01430 (JBA), 2006 WL 2790402, at *5 (D. Conn. Sept. 27,

2006) ("[F]ailure to provide plaintiff with protective equipment which every other worker on plaintiff's gang had . . . could constitute an adverse employment action because it exposed plaintiff to potentially unreasonably dangerous working conditions"); *but see Dhar v. NYC Dep't of Transp.*, No. 10-CV-05681 (ENV) (VVP), 2014 WL 4773965 at *7 (E.D.N.Y. Sept. 24, 2014) (holding that plaintiff's claim that he was "forced to conduct an inspection . . . in unsafe working conditions" was not even "arguably" an adverse employment action), *aff'd sub nom. Dhar v. N.Y.C. Dep't of Transp.*, 630 F. App'x 14 (2d Cir. 2015) (summary order). However, regardless of whether the carbon monoxide poisoning incidents satisfy the adverse employment action prong, Stancu has not made out a prima facie case of discrimination because there is no evidence that Stancu was subjected to disparate treatment with respect to the carbon monoxide incidents. To the contrary, it is undisputed that the incidents broadly affected other park staff. SUF ¶¶ 61-62, 65, 72. Nor is there any evidence that anyone at the Parks Department involved in Stancu's transfer to Washington Square Park knew of the potential future unsafe working conditions there prior to Stancu's transfer. Therefore, the facts do not give rise to an inference of discrimination. *See Todoverto*, 2016 WL 3826281, at *11 (finding no facts giving rise to an inference of discrimination where "safety issues . . . affected all of the staff" at a work location).

Further, as with his failure to promote claim, even if Stancu could make out a prima facie case of discrimination based on his transfer to Washington Square Park and his subsequent exposure to carbon monoxide, he offers nothing but speculation to rebut the non-discriminatory explanations proffered by Defendants—that his reassignment was motivated by staffing needs at Washington Square Park and that the carbon monoxide incidents were unfortunate accidents. His discrimination claim therefore fails.

### D. Failure to Accommodate

Plaintiff's failure-to-accommodate claim must be dismissed because it is time-barred. "A Title VII . . . claim is time-barred if the plaintiff does not file a charge with the EEOC 'within three hundred days after the alleged unlawful employment practice occurred.'" *Atherley v. N.Y.C. Dep't of Educ.*, No. 23-CV-00383 (JGLC), 2024 WL 1345741, at *9 (S.D.N.Y. Mar. 29, 2024) (quoting *Duplan v. City of N.Y.*, 888 F.3d 612, 621 (2d Cir. 2018)). In the case of a continuing violation, "timeliness would be measured from the latest date when the employee was still prevented from observing his religious requirements in the way he had proposed." *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134 (2d Cir. 2003). However, "[t]he Second Circuit has long held that an employer's rejection of an accommodation request is the type of discrete act which does not constitute a continuing violation." *Hinton v. Sasso*, No. 17-CV-01547, 2019 WL 13298222, at *4 (E.D.N.Y. Jan. 29, 2019) (citing *Elmenayer*, 318 F.3d at 134–35); *see also Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) (collecting cases). "As such, the 300-day clock begins the day of the proposed accommodation." *Hinton*, 2019 WL 13298222, at *4 (citing *Smith v. Johnson*, 636 F. App'x 34, 36 (2d Cir. 2016)); *see also Schwartz v. Middletown City Sch. Dist.*, No. 23-CV-01248 (KMK), 2024 WL 1257095, at *8 (S.D.N.Y. Mar. 25, 2024) ("Courts generally view each accommodation decision as a discrete act," with a claim accruing "on the date the accommodation request is rejected.") (internal references omitted).

Stancu's requested religious accommodations included both maintaining a beard despite Parks Department rules otherwise prohibiting beards and not working on Sundays so that he could attend religious services and meet other religious obligations. It is undisputed that Defendant delivered its accommodation decision on August 14, 2019, granting Stancu's request to wear a beard and partially denying his request to take every Sunday off (but granting at least

one Sunday off each month).  SUF ¶ 44.  It is also undisputed that Plaintiff filed his charge with the EEOC on June 26, 2020.  Dkt. No. 39 at 4–5.  June 26, 2020, is 317 days after August 14, 2019.  Stancu therefore failed to timely file a charge with the EEOC based on the partial denial of his accommodation request, and his claim in this Court based on the same employment decision is time-barred.

## III.  RETALIATION CLAIMS

Plaintiff's retaliation claims are predicated on similar allegations to his employment discrimination claims, and they suffer from similar evidentiary defects.

Retaliation claims under Title VII are also analyzed under the familiar *McDonnell Douglas* burden shifting framework.  *Smith v. N.Y.C.*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019).  In order to establish a prima facie case of Title VII retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks*, 593 F.3d at 164 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  As in the discrimination context, "[t]he plaintiff's burden of proof as to this first step has been characterized as minimal and de minimis."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute*, 420 F.3d at 173) (internal references omitted).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether [the] proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*, 420 F.3d at 173.

### A.  Protected Activity

The MTD Opinion held that Stancu's complaint adequately pled as protected activity (1) his phone call to the Commissioner's office on November 23, 2018; (2) his written request

for a religious accommodation on July 30, 2019; and (3) his statement to Captain Calderon and Sergeant Rivera, made between February 20, 2020 and February 28, 2020, that he would contact the mayor about "the entire situation." MTD Opinion at 11. Now, at the summary judgment stage, the Court finds that the third basis for protected activity is not supported.

Protected activity is "action taken to protest or oppose statutorily prohibited discrimination." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309 (S.D.N.Y. 2020) (quoting *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012)). "Such activity can be either formal, such as the filing of formal discrimination charges, or informal, such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'" *Champion v. N.Y. State Off. of Parks, Recreation & Historic Pres.*, 500 F. Supp. 3d 26, 48 (S.D.N.Y. 2020) (quoting *Matima v. Celli*, 228 F.3d 68, 78–79 (2d Cir. 2000)). "To succeed on a retaliation claim, the plaintiff must at least have a good-faith, reasonable belief that she was opposing an unlawful employment practice." *Leroy v. Delta Air Lines*, No. 21-267-CV, 2022 WL 12144507, at *1 (2d Cir. Oct. 27, 2022). Complaints of unfair treatment or "generalized grievances about an unpleasant or even harsh work environment, without more . . . fail to rise to the level of protected activity." *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) (summary order). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009).

### 1.    Threatened Complaint to Mayor

Stancu's February 2020 threat to complain to the mayor was not protected activity because it was a grievance about his repeated exposure to carbon monoxide at Washington

Square Park and the way that the Parks Department was handling that situation, not a complaint about statutorily prohibited discrimination. The evidence in the record shows that Stancu called supervisors Calderon and Rivera to complain that carbon monoxide incidents "keep happening" even though Stancu "thought that was going to be fixed." Stancu Dep. 264:5–8. While Stancu may have subjectively believed that the carbon monoxide poisoning was motivated by religious animus towards him (a belief that, for the reasons discussed above, has no evidentiary foundation), his complaint to his supervisors did not clarify or even suggest that he was opposing unfair treatment due to his religion. Therefore, the complaint was not protected activity for purposes of a Title VII retaliation claim. *See Rodriguez v. Beechmont Bus Serv., Inc.*, 173 F. Supp. 2d 139, 150 (S.D.N.Y. 2001) (holding that a grievance about "unsafe working conditions" could not constitute protected activity and serve as a basis for a retaliation claim under Title VII). As such, Stancu cannot make out a prima facie case of retaliation by linking allegedly retaliatory acts to his February 2020 complaint and threat to contact the mayor.

### 2.    Accommodation Request and Phone Call to the Parks Commissioner

The other two bases for protected activity are not so clearly unsupported. Courts in this Circuit recognize that requesting a reasonable accommodation *can* qualify as a protected activity. *See, e.g., Brown v. Metro. Dental Assocs.*, No. 21-CV-00851, 2023 WL 5154415, at *9 (S.D.N.Y. Aug. 10, 2023) (noting, in the context of discussing the plaintiff's Title VII and NYSHRL retaliation claims, that "requesting reasonable accommodations for pregnancy" was "certainly" a protected activity); *Farmer*, 473 F. Supp. 3d at 331–32 (explaining, in connection with assessing the plaintiff's Title VII and NYSHRL retaliation claims, that protected activity "may . . . include requests for reasonable accommodation"). And as to the November 2018 call to Commissioner Rodriguez, Stancu testified at his deposition that he informed Commissioner Rodriguez or her staff of discrimination against him. *See* Stancu Dep. 84:24–85:2. It is

18

questionable, however, that Stancu had a good-faith, reasonable belief that he was complaining of unlawful discrimination at that time—based only on a single, brief interaction during which a supervisor, unaware of his religious affiliation or its requirements, informed him accurately of the Parks Department policy that beards were not allowed—or that Commissioner Rodriguez would have understood the call to be a complaint about such discrimination. Regardless, the Court declines to decide whether either action was a protected activity because, assuming that the accommodation request and November 2018 phone call were protected activities, Stancu fails for other reasons to make out a prima facie case for retaliation based on those activities, as explained below.

### B. Adverse Employment Action and Causation

The MTD Opinion found that Stancu's complaint had adequately pled five adverse employment actions: "(1) his transfer to Washington Square Park on January 17, 2020; (2) his write-up on February 28, 2020; (3) his resignation on May 10, 2020; (4) the ongoing delay in promoting him to shielded status; (5) the constant threat of write-ups; and (5) the discriminatory comments and conduct he was subject to on a daily basis, including the weekly photographs beginning on August 15, 2019." MTD Opinion at 12. Based on the same factual deficiencies that foreclosed Stancu's discrimination claim, the transfer to Washington Square Park and the delay in promoting Stancu to shielded status cannot support a claim for retaliation. *See supra* § X. The remaining alleged adverse actions similarly fail.

For a Title VII retaliation claim, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 90 (2d Cir. 2015).

Nonetheless, the retaliation context still "requir[es] a showing of *material* adversity" and "consider[s] the perspective of a *reasonable* employee." *Hicks*, 593 F.3d at 165. Thus, the standard is objective, *id.*, but "[c]ontext matters." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. ("[A] legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.") (internal references omitted).

To establish a causal connection between the protected activity and an adverse action that followed, Plaintiff "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90. But-for causation does not require that retaliation "was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 91 (quoting *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). A causal connection can be pled "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

### 1. Resignation

"Courts generally presume that an employee's decision to resign from a position is voluntary." *Schiavone v. N.Y. State Off. of Rent Admin.*, No. 18-CV-00130 (NSR), 2018 WL 5777029, at *5 (S.D.N.Y. Nov. 2, 2018). In some cases, an employee may demonstrate that his resignation was not voluntary and was in fact constructive discharge, but the Court has already held that Stancu failed to plead constructive discharge, MTD Opinion at 15, and Stancu has offered no evidence to support that theory. Consequently, Stancu's voluntary resignation is not

an adverse employment action that can support a Title VII retaliation claim. *Schiavone*, 2018 WL 5777029, at \*5; *see also Shaw v. Yale New Haven Hosp.,* No. 18-CV-00067 (VLB), 2020 WL 1923599, at \*11 (D. Conn. Apr. 21, 2020) ("Plaintiff was not subject to an adverse employment action in that she voluntarily resigned.").

### 2.    Threat of Write-Ups

"The law in this Circuit is clear that the threat of disciplinary action, without more, does not constitute an adverse employment action." *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 407 (S.D.N.Y. 2014). However, that principle emerged from the context of discrimination claims, and as the MTD Opinion noted, the same threats of discipline that are inadequate to support discrimination claims may satisfy the broader adverse-action standard that is applicable to retaliation claims. *See* MTD Opinion at 11. Nevertheless, "courts have found that 'reprimands, threats of disciplinary action and excessive scrutiny' do not constitute adverse actions in a Title VII retaliation context." *Anand v. N.Y. State Dep't of Tax'n & Fin.*, No. 10-CV-05142 (SJF) (WDW), 2013 WL 3874425, at \*9 (E.D.N.Y. July 25, 2013) (quoting *Taylor v. N.Y.C. Dep't of Educ.,* 2012 WL 5989874, \*9 (E.D.N.Y. Nov. 30, 2012)); *see also Gittens-Bridges v. City of N.Y.*, No. 19-CV-00272 (ER), 2020 WL 3100213, at \*19 (S.D.N.Y. June 11, 2020) ("[Plaintiff] has failed to state a claim of retaliation . . . because threats of discipline are not an adverse employment action.").

Without opining as to whether threats of disciplinary action categorically cannot constitute adverse employment actions for purposes of a Title VII retaliation claim, the Court holds that they cannot do so here because the relevant conduct was not materially adverse. Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 162 (quoting *Burlington*, 548 U.S. at 57). The evidence—

comprising testimony that Stancu was instructed on a few occasions to issue more citations—falls far short of establishing that a reasonable employee could have considered the warnings to be a material adversity.  *See Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) ("[O]ral and written warnings do not amount to materially adverse conduct" required in a retaliation claim.).

Moreover, Stancu has offered nothing to show that his protected activity was a but-for cause of the alleged threats of disciplinary action.  To the contrary, he testified that the threats of write-ups were due to Sergeant Candia being a "ticket-hungry guy" who "had a problem" with Stancu being "the type of guy" who gave verbal warnings.  Stancu Dep. 272:8–22.  In all, the record shows that the supposed threats of disciplinary action, whatever their policy wisdom, comprised ordinary supervisory conduct unrelated to Stancu's religious adherence or requests for religious accommodation.

### 3.    Harassing Comments and Conduct

Along similar lines, the vaguely asserted "daily" discriminatory comments and conduct do not rise to the level of a materially adverse employment action.  The Second Circuit has held that "petty slights or minor annoyances" are not materially adverse for purposes of a Title VII retaliation claim.  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24–25 (2d Cir. 2014) (internal references omitted).  More specifically, "[n]egative comments . . . are not, standing alone, adverse employment actions, because mere comments do not materially affect employment."  *Teachout v. N.Y.C. Dep't of Educ.*, 2006 WL 452022, at *13 (S.D.N.Y. Feb. 22, 2006) (analyzing retaliation in the ADA context); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 n.3 (2d Cir. 1996) (holding that plaintiff "cannot fairly characterize . . . occasional nastiness" as "an adverse employment decision or action disadvantaging [plaintiff], which is a prerequisite for a retaliation claim"); *Scott v. City of N.Y.*

22

*Dep't of Corr.,* 641 F.Supp.2d 211, 231 (S.D.N.Y. 2009) ("[V]erbal abuse is typically

insufficient to constitute an adverse employment action because negative or otherwise insulting

statements are hardly even actions, let alone adverse actions.") (quoting *Blake v. Potter*, 2007

WL 2815637, at *8 (S.D.N.Y. Sept. 25, 2007)) (internal references omitted).

At most, the record supports that Stancu's supervisors occasionally made rude comments

or inappropriate jokes. *See* Stancu Dep. 182:10–183:1 (Candia "talk[ed] trash" and joked about

"how ugly" Stancu's beard was "over ten" times during Stancu's entire employment); *id.*

183:14–184:6; 188:1–3 (Sergeant Dejesus made five or six comments "making fun, jokes, and

comments" about Stancu's beard, including "questioning if [Stancu] was . . . Arabic"); *id.* 188:

11–14 (Captain Johnson asked about church about three or four times). Such conduct falls into

the category of petty slights and annoyances that cannot support a retaliation claim. *See Smith v.*

*City of N.Y.*, No. 15-CV-04493 (RJS), 2016 WL 4574924, at *11 (S.D.N.Y. Sept. 1, 2016)

("Plaintiff's complaints of teasing and laughing are insufficient to state a claim of retaliation

because these actions are 'unpleasant matters that do not rise to the level of adverse ... actions.'")

(quoting *Ramsey v. N.Y.C. Health & Hosps. Corp.*, No. 98-CV-1594 (RPP), 2000 WL 713045, at

*12 (S.D.N.Y. June 2, 2000)).

The allegedly weekly pictures also cannot constitute materially adverse actions. Stancu

admits that the pictures were taken to ensure compliance with the Parks Department's rules

regarding beards, following a directive from a senior supervisor for sergeants to monitor and

enforce those rules. Stancu Dep. 198:5–9. Although Stancu may object to being subjected to

close scrutiny, "excessive monitoring is not actionable, because it does not amount to an adverse

employment action." *Longe v. City of N.Y.*, No. 16-CV-05705 (AKH), 2019 WL 13368984, at

*5 (S.D.N.Y. Mar. 21, 2019), *aff'd*, 802 F. App'x 635 (2d Cir. 2020) (analyzing retaliation

claim); *see also Petyan v. N.Y.C. L. Dep't*, No. 14-CV-01434 GBD JLC, 2015 WL 1855961, at *13 (S.D.N.Y. Apr. 23, 2015), *report and recommendation adopted*, 2015 WL 4104841 (S.D.N.Y. July 2, 2015) ("Courts in this Circuit regularly find that schedule changes and close monitoring do not constitute adverse employment actions in the retaliation context.")*.

Stancu also fails to show causation.  Notably, the allegedly harassing comments began on Stancu's first or second day on the job—before he had engaged in any protected activity at all. *See* Stancu Dep. 53:24–54:13.  "It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."  *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013), *aff'd*, 641 F. App'x 60 (2d Cir. 2016).  It is true that there is a strong temporal link between Stancu's July 2019 accommodation request and the weekly photographs of his beard beginning in August 2019.  However, that timing is entirely consistent with the explanation articulated by Defendants and supported with evidence:  that the sergeants had been instructed to closely monitor Rangers' facial hair to ensure that Rangers who had been granted accommodations were complying with Department rules that prohibited certain styling even for those generally permitted to maintain beards.  Stancu offers nothing to rebut the proffered non-retaliatory reason for the conduct.

### 4.    February 28, 2020 Write-Up

Stancu *could* establish a materially adverse employment action based on being written up for insubordination in February 2020.  *See Suarez v. N.Y.C. Dep't of Hum. Res. Admin.,* No. 09-CV-8417 (WHP), 2011 WL 1405041, at *6 (S.D.N.Y. Mar. 24, 2011) (holding that a "write up" constituted an adverse employment action).  But he cannot make out a prima facie case for retaliation because he cannot show a causal relationship between the write-up and his prior protected activity.  His own testimony states that the write-up had nothing to do with his beard or

religious beliefs. *See* Stancu Dep. 199:5–13. The write-up was instead based on the circumstances surrounding the carbon monoxide incidents at Washington Square Park. Stancu would likely be successful at showing a causal connection between his complaints regarding those incidents and his subsequent write-up, but as explained above, the safety situation was not discriminatory and his complaints about it do not qualify as protected activity.

#### 5. Aggregated Conduct

"In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation must be considered 'both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable.'" *Bamba v. United States Dep't of Homeland Sec.*, No. 22-CV-07407 (LJL), 2024 WL 3924810, at *12 (S.D.N.Y. Aug. 23, 2024) (quoting *Hicks*, 593 F.3d at 165)). But even taking the entire pattern of allegedly harassing conduct into account, the record does not support a finding of material adversity. *See Cody v. Cnty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009) ("[E]ngaging in a pattern of conduct that created a hostile working environment including altercations . . . [is] not [an] adverse employment action[] for purposes of a retaliation claim.").

### IV.    HOSTILE WORKING ENVIRONMENT

The MTD Opinion held that Stancu's complaint sufficiently pled a hostile work environment claim based on the same set of allegations that the Court has now found to be insufficient to survive summary judgment on his discrimination and retaliation claims. Specifically, the MTD Opinion noted allegations "that a supervisor left a note in Plaintiff's locker telling him to 'get the fuck out of here' and to work at his church instead, that he was asked to 'prove his religious beliefs' with a letter from church, that he was made to work in a facility with a known health risk, and that he was told by his supervisors to 'choose between keeping his job or his beard,' and that 'no religion Union crook will change our rules.'" MTD

Opinion at 14.  As with the other claims, now that discovery is complete, it is clear that Stancu's hostile work environment claim cannot be supported.

"To establish a hostile work environment, a plaintiff must [show] that a defendant's conduct: (1) was objectively severe or pervasive in that it created an environment that a reasonable person would find hostile or abusive; (2) created an environment that the plaintiff subjectively perceived as hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic." *Sherman v. Fivesky, LLC*, 2020 WL 2136227, at *5 (S.D.N.Y. May 5, 2020) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  Stancu cannot satisfy the first factor.

The first factor requires a plaintiff to "show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002); *accord Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014).  That showing requires a plaintiff to identify incidents that are "more than episodic;" that is, the incidents "must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal references omitted).  "In considering whether a plaintiff has met this burden, courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera*, 743 F.3d at 20 (internal references omitted).

As explained above, the record shows that the hostile conduct alleged by Stancu was either non-discriminatory (*e.g.*, the carbon monoxide incidents) or did not alter the conditions of Stancu's employment (*e.g.*, the allegedly harassing comments), or both.  Further, the record

26

belies Stancu's characterization of facts that were previously accepted at the motion to dismiss stage. For example, the allegation that the note reading "get the fuck out of here" was placed in Stancu's locker by Sergeant Candia turns out to be pure speculation based only on the fact that Stancu saw Candia "in the building that day." Stancu Dep. 308:17–25. The allegation that Stancu was forced to "prove his religious beliefs" is based on Sergeant O'Neill merely telling Stancu that he could not allow a ranger to wear a beard without the proper documentation (*i.e.*, an accommodation), which was a statement entirely consistent with both Parks Department policy and Title VII's protections. *See* Stancu Dep. 61:22–62:8.

All things considered, Plaintiff is simply unable to show misconduct on the part of Defendant that is sufficiently severe or pervasive. The Court does not doubt that Stancu faced some uncomfortable behavior from colleagues and supervisors that he found unpleasant and offensive, but "excessive criticism and rudeness do not constitute a hostile work environment." *Ramirez v. Temin & Co.*, No. 20-CV-6258, 2021 WL 4392303, at *8 (S.D.N.Y. Sept. 24, 2021). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." *Isbell v. City of N.Y.*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018) (internal references omitted). For the most part, Stancu merely endured occasional teasing, which is not actionable. *See Polite v. Khan Funds Mgmt. Am., Inc.*, No. 17-CV-2988 (GBD), 2018 WL 894394, at *6 (S.D.N.Y. Feb. 5, 2018) ("As the Supreme Court has made clear, 'occasional teasing' does not create a hostile work environment." (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998))).

Beyond teasing, Stancu alleges a handful of specific comments over the course of one to two years. The circumstances are no more severe and pervasive than in other cases that have been dismissed by courts in this Circuit. *See, e.g., Littlejohn v. City of N.Y.*, 795 F.3d 297, 321

27

(2d Cir. 2015) (upholding the dismissal of a hostile work environment claim and concluding that allegations that the employer made negative statements about the plaintiff, was impatient and used harsh tones with the plaintiff, required the plaintiff to recreate work, wrongfully reprimanded the plaintiff, increased the plaintiff's schedule, and was sarcastic to the plaintiff, could not support a finding of a severe or pervasive hostile work environment); *Marquez v. City of N.Y.*, No. 14-CV-8185, 2016 WL 4767577, at *8 (S.D.N.Y. Sept. 12, 2016) (comment that plaintiff was "nice and tight," massaging plaintiff's back, and putting fingers past belt area down plaintiff's pants not objectively severe)*; Liburd v. Bronx Lebanon Hosp. Ctr.,* 2009 WL 900739, at *1, *8-9 (S.D.N.Y. Apr. 3, 2009) (no hostile work environment where supervisor ignored and spoke to plaintiff harshly at meetings and referred to her as "black ass" on three occasions), *aff'd,* 372 F. App'x 137, 139-40 (2nd. Cir. 2010); *see also Alfano,* 294 F.3d at 379 (collecting cases in the Circuit that ruled evidence insufficient as a matter of law to show conduct altered the terms of employment, despite conduct that was more severe than the conduct in this case).

Perhaps the most severe conduct is the "get the fuck out of here" note placed in Stancu's locker. As already noted, Stancu attributes that action to his Sergeant Candia based only on speculation. But even assuming Candia did place the note, a single arguably severe action does not necessarily create a hostile work environment, even if the employee was additionally subjected to other, less severe actions. *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118–19 (2d Cir. 2010) (holding that a single openly racial incident, in addition to actions by the defendants towards the plaintiff in which they "wrongly excluded her from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her" was insufficient to establish a

hostile work environment). Based on all the evidence, viewed in the light most favorable to Stancu, the aggregated conduct does not rise to the level of a hostile work environment.

**CONCLUSION**

For the reasons stated herein, Defendant's motion for summary judgment (Dkt. No. 77) is GRANTED. The Clerk of Court is respectfully directed to enter judgment for the Defendant and CLOSE this case.


Dated: August 25, 2025
        New York, New York


                              SO ORDERED.


                              _____
                              MARGARET M. GARNETT
                              United States District Judge